1
2
3
4
5
6
7

8 **UNITED STATES DISTRICT COURT**

9 **EASTERN DISTRICT OF CALIFORNIA**

10

11 MOLLIE C. PEREZ,                          )   Case No.: 1:15-cv-00236 - JLT
                                           )
12          Plaintiff,                      )   ORDER DIRECTING ENTRY OF JUDGMENT IN
                                           )   FAVOR OF DEFENDANT CAROLYN COLVIN,
13     v.                                   )   ACTING COMMISSIONER OF SOCIAL
                                           )   SECURITY
14 CAROLYN W. COLVIN,                       )
   Acting Commissioner of Social Security,  )
15                                          )
            Defendant.                      )
16 _____  )

17          Mollie Christine Perez asserts she is entitled to period of disability and disability insurance

18 benefits under Title II of the Social Security Act.  Plaintiff argues the administrative law judge erred in

19 evaluating the medical record and in rejecting the credibility of her subjective complaints.  Because the

20 ALJ applied the proper legal standards and substantial evidence supports the determination, the

21 administrative decision is **AFFIRMED**.

22                                  <u>**BACKGROUND**</u>

23          On February 3, 2011, Plaintiff filed applications for benefits, in which she alleged disability

24 beginning July 25, 2010.  (Doc. 16 at 2.)  The Social Security Administration denied Plaintiff's claim

25 for benefits at the initial level on July 13, 2011, and upon reconsideration on February 6, 2012.  (Doc.

26 13-4 at 87, 98.)  Plaintiff requested a hearing, and testified before an administrative law judge ("ALJ")

27 on October 18, 2012.  (Doc. 13-3 at 55.)  On October 24, 2012, the ALJ denied her claim.  (Doc. 13-4

28 at 37.)

The Appeals Council reviewed Plaintiff's case and remanded for a new hearing.  (*Id.* at 44.)  Plaintiff again testified before an ALJ on May 6, 2014.  (Doc. 13-3 at 12.)  The ALJ issued a decision denying Plaintiff's application for benefits on August 15, 2014.  (*Id.* at 20.)  Plaintiff requested for review of the decision once more, but the Appeals Council denied the request on December 12, 2014.  (*Id.* at 2.)  Therefore, the ALJ's determination became the final decision of the Commissioner of Social Security ("Commissioner").

## STANDARD OF REVIEW

District courts have a limited scope of judicial review for disability claims after a decision by the Commissioner to deny benefits under the Social Security Act.  When reviewing findings of fact, such as whether a claimant was disabled, the Court must determine whether the Commissioner's decision is supported by substantial evidence or is based on legal error.  42 U.S.C. § 405(g).  The ALJ's determination that the claimant is not disabled must be upheld by the Court if the proper legal standards were applied and the findings are supported by substantial evidence.  *See Sanchez v. Sec'y of Health & Human Serv.*, 812 F.2d 509, 510 (9th Cir. 1987).

Substantial evidence is "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197 (1938)).  The record as a whole must be considered, because "[t]he court must consider both evidence that supports and evidence that detracts from the ALJ's conclusion."  *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985).

## DISABILITY BENEFITS

To qualify for benefits under the Social Security Act, Plaintiff must establish she is unable to engage in substantial gainful activity due to a medically determinable physical or mental impairment that has lasted or can be expected to last for a continuous period of not less than 12 months.  42 U.S.C. § 1382c(a)(3)(A).  An individual shall be considered to have a disability only if:

> his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

2

42 U.S.C. § 1382c(a)(3)(B).  The burden of proof is on a claimant to establish disability.  *Terry v. Sullivan*, 903 F.2d 1273, 1275 (9th Cir. 1990).  If a claimant establishes a prima facie case of disability, the burden shifts to the Commissioner to prove the claimant is able to engage in other substantial gainful employment.  *Maounis v. Heckler*, 738 F.2d 1032, 1034 (9th Cir. 1984).

<u>**ADMINISTRATIVE DETERMINATION**</u>

To achieve uniform decisions, the Commissioner established a sequential five-step process for evaluating a claimant's alleged disability. 20 C.F.R. §§ 404.1520, 416.920(a)-(f).  The process requires the ALJ to determine whether Plaintiff (1) engaged in substantial gainful activity during the period of alleged disability, (2) had medically determinable severe impairments (3) that met or equaled one of the listed impairments set forth in 20 C.F.R. § 404, Subpart P, Appendix 1; and whether Plaintiff (4) had the residual functional capacity to perform to past relevant work or (5) the ability to perform other work existing in significant numbers at the state and national level.  *Id.*  The ALJ must consider testimonial and objective medical evidence.  20 C.F.R. §§ 404.1527, 416.927.

**A.     Relevant Medical Evidence**

In August 2009, Plaintiff sought treatment at the Northwest Medical Group, reporting that "for the last 2-3 years she [had] been having left should pain with radiation between should blades on/off."  (Doc. 13-8 at 39.)  She described the pain as a "dull ache, constant," which changed to a "stabbing" pain with movement.  (*Id.*)  Dr. Martin Wenthe determined Plaintiff had "[b]ilteral middle paraspinal muscle tenderness," "[m]ildly reduced flexion," and "mildly reduced left lateral motion."  (*Id.*)  He referred Plaintiff to physical therapy.  (*Id.* at 40.)

Plaintiff attended six physical therapy sessions with Michael Jimenez for treatment of her neck and shoulder pain.  (Doc. 13-8 at 2.)  On September 29, 2009, Mr. Jimenez noted that Plaintiff "demonstrated ongoing palpatory tenderness of bilateral supraspinatus and bicep tendon insertions of shoulder, indicative of ongoing inflammation."  (*Id.*)  However, Plaintiff reported her shoulders were "doing better and were no longer 'achy' at rest."  (*Id.*)  Plaintiff requested that she be discharged from physical therapy, reporting she was "unable to afford [it]… secondary to a high deductible and financial constraints."  (*Id.*)  Mr. Jimenez believed Plaintiff would experience "ongoing inflammation should she neglect treatment of her condition," but discharged Plaintiff as requested.  (*Id.*)

In October 2009, Plaintiff complained of fatigue, fever, and shortness of breath. (Doc. 13-8 at 34, 25) Dr. Matthew Lozano ordered x-rays, and found "[n]o active disease" in the chest. (*Id.* at 34) However, he determined Plaintiff had degenerative disc disease in the thoracic spine. (*Id.*)

On February 2, 2010, Alison Lansing, a marriage and family therapist, conducted a diagnostic interview with Plaintiff, "who requested therapy due to stress at work." (Doc. 13-8 at 7, 9.) Plaintiff reported she worked as a group travel agent, and had an "increased work load" after the company laid off some employees. (*Id.*) She reported being overwhelmed, having "panic attacks at work and at home," "decreased energy, difficulty concentrating at work," and feeling tired. (*Id.*) Plaintiff said she could not "remember the last time she slept through the night," and when she awakened, she felt tense and "beaten up in shoulders and back." (*Id.*) Plaintiff had her first therapy session with Ms. Lansing on February 8, at which Plaintiff reported she felt "anxious from work" and "scatterbrained, distracted" over the weekend. (*Id.*)

On February 10, 2010, Dr. Lozano examined Plaintiff and found she had "bilateral middle paraspinal muscle tenderness, "mildly reduced flexion," and "left lateral motion." (Doc. 13-8 at 19.) He also noted Plaintiff reported depression, anxiety, and insomnia. (*Id.*) Dr. Lozano found no change in Plaintiff's personality, "no memory problems, no mood swings,… [and] no suicide ideation." (*Id.*) He prescribed sleeping medication to Plaintiff. (*Id.* at 5.)

On February 18, 2010, Plaintiff told Ms. Lansing she did not have any panic attacks during the prior week. (Doc. 13-8 at 5.) Plaintiff said she was sleeping longer with the prescribed mediation, but was "still very tired." (*Id.*) Ms. Lansing opined Plaintiff had a major depressive disorder and an anxiety disorder, not otherwise specified. (*Id.* at 10) She noted Plaintiff's goal was to decrease her anxiety and stress, and believed Plaintiff's prognosis was "good." (*Id.*) In March 2010, Plaintiff continued to report she was "doing better with [anxiety]" and "sleeping better," though still tired. (*Id.* at 4) Plaintiff then discontinued her therapy sessions with Ms. Lansing, stating she "want[ed] to catch up on copays" and would "call when ready to [return]." (*Id.* at 3)

Dr. Lozano examined Plaintiff on March 30, 2010, and found she was "[o]riented to person, place, time and general circumstance." (Doc. 13-8 at 16.) Dr. Lozano opined Plaintiff's mood was "appropriate" and she exhibited "[n]ormal judgment and insight." (*Id.*)

On July 30, 2010, Plaintiff told Dr. Lozano that her anxiety had increased, and she felt "emotionally paralyzed." (Doc. 13-8 at 44.) She also told Dr. Lozano that she "[w]ould rather not work." (*Id.*) Plaintiff reported "[n]o change in personality, no memory problems, [and] no mood swings." (*Id.* at 45.) According to Dr. Lozano, Plaintiff was "[o]riented to person, place, time and general circumstances." (*Id.*) In addition, Plaintiff exhibited normal judgment and insight. (*Id.*) He recommended Plaintiff see a counsellor and would "need to take time off." (*Id.* at 46.)

On May 5, 2011, Dr. Rustom Damania a conducted a consultative physical examination of Plaintiff. (Doc. 13-8 at 48- 53.) Plaintiff complained of having "joint pains for one year," "psychiatric problems, hyperlipidemia and obesity." (*Id.* at 48.) Plaintiff reported the only medication she was taking was Excedrin and Advil PM. (*Id.*) Dr. Damania observed that Plaintiff was "a well-developed, obese female in no distress," and "was alert, cooperative and well-oriented in all spheres." (*Id.* at 50.) Dr. Damania found "no tenderness to palpation in the midline or paraspinal areas" and "no muscle spasm." (*Id.*) Plaintiff's range of motion was normal in her back, shoulders, elbows, and hands. (*Id.* at 51.) In addition, Dr. Damania determined Plaintiff had "good active tone" and her strength was "5/5 in all extremities." (*Id.* at 52.) Dr. Damania concluded: "The patient should be able to lift and carry 20 pounds occasionally and 10 pounds frequently. The patient can stand and walk six hours out of an eight hour work day with normal breaks. The patient can sit six hours." (*Id.* at 53.) Dr. Damania did not find any postural, manipulative, visual, or communicative impairments. (*Id.*)

Dr. Sadda Reddy reviewed Plaintiff's medical record on May 19, 2011. (Doc. 13-8 at 54-56.) Dr. Reddy opined there were "no treatment records to support [Plaintiff's] allegations of pain." (*Id.* at 54.) In addition, Dr. Reddy observed that Plaintiff had a "[n]ormal exam of all joints including fingers" as well as "[n]ormal strength, sensation and gait." (*Id.* at 56.) According to Dr. Reddy, the limitation to light work—as recommended by Dr. Damania—had "no objective basis considering a normal physical exam." (*Id.*)

On May 23, 2011, Plaintiff went to Dr. Lozano, complaining of seasonal allergies, anxiety, and joint pain. (Doc. 13-8 at 85-86.) Dr. Lozano observed that Plaintiff was "[o]riented to person, place, time and general circumstances," and Plaintiff continued to have an "appropriate" mood and affect with "[n]ormal judgement and insight." (*Id.* at 86.)

Dr. Steven Swanson conducted a psychological assessment on May 24, 2011. (Doc. 13-8 at 57.) He administered the Wechsler Adult Intelligence Scale-Fourth Edition (WAIS-IV), Wechsler Memory Scale-Fourth Edition (WMS-IV), Bender Visual-Motor Gestalt Test, 2nd Ed. (Bender-Gestalt II), and Trail Making Test. (*Id.* at 57-58.) The plaitntiff told Dr. Swanson that she was not taking any medication, and could not afford the prescribed anti-depressant. (*Id.* at 58-59.) Plaintiff said she was "independently able to complete all activities of daily living," and spent her day reading, doing crossword puzzles, on the computer, and visiting the library. (*Id.* at 59.) Dr. Swanson found Plaintiff's "[s]hort-term, recent, and remote memories were within normal limits." (*Id.*) Also, he determined Plaintiff had a full scale I.Q. of 89 with the WAIS-IV, and her WMS-IV scores did "not reveal relative weakness in memory functioning." (*Id.* at 61.) Dr. Swanson believed Plaintiff "maintained satisfactory attention and concentration and the results [were] considered a valid representation of her functioning." (*Id.* at 60.) He concluded Plaintiff's "mental and emotional functioning [fell] within normal limits." (*Id.* at 62.)

Dr. Rosalia Pereya completed a psychiatric review technique form on July 6, 2011. (Doc. 13-8 at 65.) She believed Plaintiff had an adjustment disorder with an anxious and depressed mood, but this caused no restrictions on her activities of daily living; no difficulties maintaining social functioning; no difficulties in maintaining concentration, persistence, or pace. (*Id.* at 68, 75.) Dr. Pereya noted Plaintiff was not taking psychiatric medication, and concluded her symptoms were not severe. (*Id.* at 77.)

In September 2011, Plaintiff returned to Northwest Medical Group for treatment. (Doc. 13-8 at 81-83.) Plaintiff reported her anxiety was "getting worse" and she was "[h]aving trouble getting out of the house." (*Id.* at 81.) Dr. Lozano believed Plaintiff exhibited normal judgement and insight, but appeared "depressed, anxious, [and] apprehensive." (*Id.* at 82.) He prescribed Cymbalta for Plaintiff, and recommended she "check in" with her counselor. (*Id.* at 83.)

In November 2011, Plaintiff told Dr. Lozano that she "[c]ould not take the cymbalta with[out feeling] [n]ausea and feeling weird." (Doc. 13-8 at 89.) She stopped taking the medication and "[t]hen got very depressed." (*Id.*) Dr. Lozano observed Plaintiff appeared depressed, but was "not nervous/anxious." (*Id.*) Further, Dr. Lozano opined Plaintiff's memory, cognition, and judgment were normal. (*Id.*)

6

1   Dr. Ernest Wong reviewed the record and completed a case analysis on December 27, 2011.

2   (Doc. 13-8 at 93.)  Dr. Wong observed that Plaintiff "doesn't allege any physical issues" and "overall"

3   her examination results were "completely" normal.  (*Id.*)  Dr. Wong concluded Plaintiff's physical

4   impairments were not severe.  (*Id.*)

5   Dr. Frances Breslin completed a psychiatric review technique form and mental residual

6   functional capacity assessment on January 7, 2012.  (Doc. 13-8 at 94-112.)  Dr. Breslin opined Plaintiff

7   suffered from an adjustment disorder with mixed anxiety depressed mood.  (*Id.* at 97.)  Dr. Breslin

8   believed Plaintiff had mild restriction of activities of daily living; mild difficulties in maintaining social

9   functioning; and moderate difficulties in maintaining concentration, persistence or pace.  (*Id.* at 104.)

10  Specifically, Dr. Breslin indicated Plaintiff was "not significantly limited" in all areas of understanding,

11  memory, concentration, persistence, and social interaction.  (*Id.* at 109-11.)  However, she was

12  "moderately" limited with "[t]he ability to respond appropriately to changes in the work setting."  (*Id.*

13  at 111.)  Dr. Breslin concluded Plaintiff was able to "understand and remember simple and detailed

14  instructions." (*Id.* at 112.)  Additionally, Dr. Breslin opined Plaintiff was able to "work a typical 8-hour

15  workday," including appropriate interactions with the public, peers, and supervisors.  (*Id.*)

16  On August 3, 2012, Plaintiff told Dr. Lozano that she was "[f]eeling more anxiety over forms

17  with SSI" and her pain was worse.  (Doc. 13-9 at 14.)  She reported her joints were "painful" and she

18  had knee and "mid back pain with movement."  (*Id.*)  Plaintiff reported she "[h]ad been unable to afford

19  testing." (*Id.*)  Dr. Lozano found Plaintiff exhibited "decreased range of motion" in both knees and her

20  thoracic spine.  (*Id.*)

21  On August 6, 2012, Plaintiff visited Clinica Sierra Vista for treatment.  (Doc. 13-9 at 50.)  She

22  told Dr. Getta Ramesh that she had "sharp and throbbing" pain in her knees, which was "aggravated by

23  bending, sitting and walking."  (*Id.*)  In addition, Plaintiff said she had pain in her neck and back.  (*Id.*)

24  Dr. Ramesh determined Plaintiff had a normal gait and "[n]ormal range of motion, muscle strength, and

25  stability in all extremities with no pain on inspection."  (*Id.* at 52.)  Dr. Ramesh ordered x-rays of

26  Plaintiff's knees, lumbar spine, and cervical spine.  (*Id.* at 52, 55.)  Upon review of the images, Dr.

27  Ramesh concluded Plaintiff had mild degenerative joint disease in her knees and "narrowing of spaces

28  in the LSpine."  (*Id.* at 55.)

7

On September 4, 2012, Plaintiff returned to Ms. Lansing for an evaluation, after calling to inquire whether Ms. Lansing "would be willing to assess [Plaintiff] for symptoms and to complete a form for further consideration for disability." (Doc. 13-9 at 35.)  Ms. Lansing noted:

> She stated she has a hard time remembering simple instructions, gets sidetracked often.  She is unable to read more than one to two paragraphs of a book or magazine.  When listening to friends or family talk, she is able to absorb what they are saying for approximately 5 minutes before she becomes overwhelmed with the effort to process it.  She avoids people, avoids crowds, needs a quiet environment around her.  She sits in a recliner at her home with her feet up (due to pain) and is unable to do much more.  She said she feels guilty that she doesn't do more.  She sees, for example, a dirty floor and is unable to think about doing it.  She feels overwhelmed with the effort.  Regarding hygiene, she showers every three days because the effort is too great.  She does household tasks in stages, regrouping in between.  She noted she was forgetful, loses things.  She noted she has gotten up several times to do the same task only to forget what she was supposed to do.  She is unable to watch television shows that require thinking.

(*Id.* at 35-36.)  Ms. Lansing opined Plaintiff "appeared sincere" when describing her life.  (*Id.* at 36.) Based upon the symptoms Plaintiff described, Ms. Lansing opined Plaintiff could not "cope with the changes, interruptions, public contact, or organization required to function in typical jobs." (*Id.*)  She concluded Plaintiff was not "able to function in any work situation at [that] time." (*Id.*)

On September 27, 2012, Will Freeman, a physical therapist, completed an assessment of Plaintiff's physical abilities.  (Doc. 13-9 at 37.)  He noted Plaintiff had bilateral knee pain and osteoarthritis.  (*Id.*)  Mr. Freeman opined that Plaintiff could only walk one city block before needing a rest, sit for no more than 20 minutes at a time, stand for only ten minutes at a time, and occasionally lift ten pounds.  (*Id.*)  In addition, Mr. Freeman believed Plaintiff required an unscheduled ten minute break every 20 minutes.  (*Id.*)

**B.     Administrative Hearings**

Plaintiff testified at two hearings before administrative law judges.  The first hearing was held on October 18, 2012, and after the matter was remanded by the Appeals Council, she testified before another ALJ on May 16, 2014.  (*See* Doc. 13-3 at 12, 30, 57.)

1.     October 18, 2012

Plaintiff testified she had a high school education and earned a certificate after completing vocational training in travel administration.  (Doc. 13-3 at 62, 79.)  Plaintiff explained the certificate enabled her "to work in the travel and hospitality field." (*Id.* at 79.)

She reported that she suffered from hyperlipidemia, joint pain, dysthymic disorder, obesity, panic attacks, hyperthyroidism, osteoarthritis, anxiety, and depression.  (Doc. 13-3 at 62.)  Plaintiff said she had pain in her knees, neck, middle of her back, and sciatic nerve.  (*Id.* at 75.)  She testified that she was "seeing a physical therapist" for the pain in her knees, and took prescription medication for her anxiety and depression.  (*Id.* at 74-75.)

Plaintiff stated that she "[woke] up every morning feeling anxious."  (Doc. 13-3 at 77.)  She testified that she did not "want contact with anybody" and avoided people she did not know.  (*Id.* at 75.)  Plaintiff explained she felt like she was "always in a fog," and had difficulty with concentration.  (*Id.* at 63, 75.)  She estimated she could pay attention for "about 5 minutes before [her] mind just trails off, and shuts off."  (Doc. 13-3 at 63.)

Plaintiff testified that she lived with her twenty-five-year old daughter.  (Doc. 13-3 at 67.)  Plaintiff said she cooked meals "maybe three times a week," and the meals were always "something very simple."  (*Id.* at 68.)  Plaintiff reported she did not clean the bathrooms, empty the trash, iron clothes, go grocery shopping, mop, dust, or wash windows.  (*Id.* at 69-70, 74.)  She stated that she did laundry "[o]nce every two weeks," and would fold the clothes to put them away.  (*Id.*)

She estimated she was able to lift and carry ten pounds without hurting herself.  (Doc. 13-3 at 63.)  Plaintiff believed she was able to sit for "[a]pproximately 20 minutes" before needing to move around, stand for "[a]pproximately 20 minutes," and walk "[a]bout 5 to 7 minutes."  (Doc. 13-3 at 63.)  Plaintiff said she was not able to bend over, and that if she had to pick something up, it caused her to run out of breath.  (*Id.* at 64.)

2.    May 16, 2014

*a.    Plaintiff's testimony*

After the Appeals Council remanded the matter for further proceedings, Plaintiff appeared at a second administrative hearing.  (Doc. 13-3 at 12.)  Plaintiff said she was "always in pain somewhere," with the worst pain located in her left shoulder, left knee, and her sciatic nerve.  (*Id.* at 40.)  She stated that she also had pain in her back, elbow, and ankle.  (*Id.* at 41.)  Further, Plaintiff reported she suffered from panic attacks, difficulty with concentration, anxiety, and depression.  (*Id.* at 34-35, 43.)

She testified she had panic attacks and did not leave her house "unless [she] absolutely [had] to." (Doc. 13-3 at 35, 43)  She stated she did not attend any social activities or church, and had only limited contact friends and family.  (*Id.*)  Plaintiff explained her family was "very angry at [her]" because she did not see them often, and it was only "once in a great while" that she saw a childhood friend.  (*Id.*)  Plaintiff reported her "social life is [her] phone," which she used to "play very simple games" and listen to music.  (*Id.* at 36.)  She said she spent "most of [the] day" sitting in a reclining chair, where Plaintiff could put her feet up if her legs started bothering her.  (*Id.*)

Plaintiff said she could not read because she would "lose focus" and if she read more than a paragraph she would "just delete it," so she no longer read books or magazines. (Doc. 13-3 at 35; *see also id.* at 47.)  In addition, Plaintiff reported she was unable to concentrate on television shows, but would get "lost" while watching shows.  (*Id.* at 45-46.)  She stated she made "simple things" in the microwave, and that her daughter did most of the cooking because Plaintiff could not follow recipes and would "leave stuff out."  (*Id.* at 35.)

According to Plaintiff, her doctors first indicated her physical problems were "because of [her] anxiety and depression," but her shoulder pain "ha[d] gotten real bad."  (Doc. 13-3 at 38.)  She said that her left shoulder was "basically useless" and she could not "raise it up to take off a shirt."  (*Id.* at 34, 38)  She reported she went to physical therapy for her shoulders, but stopped due to pain.  (*Id.* at 39.)  Plaintiff testified she needed assistance with showering and dressing, and she would "only shower every four days because it's very taxing physically and mentally to prepare for a shower."  (*Id.* at 34.)  In addition, she reported she had "a real problem" even trying to get a gallon of milk out of a refrigerator and with lifting it to pour.  (*Id.* at 41.)

She estimated that she was able to stand for "about ten minutes" at one time, and said the most she could walk was "about three minutes," which was how long it took to walk to her mailbox.  (Doc. 13-3 at 42.)  Plaintiff reported she was unable to climb stairs or bend over to pick up items.  (*Id.*)

### b. *Vocational expert testimony*

Vocational expert Judith Najarian (the "VE") classified Plaintiff's past work as reservation clerk, *DOT* 238.362-014.  (Doc. 13-3 at 50.)  The VE explained that under the *Dictionary of*

*Occupational Titles*, the position was classified as sedentary work.[1]  (*Id.*)  The VE opined Plaintiff had skills transferable "[t]o other travel-related titles, such as a travel agent or travel clerk, or even just data entry."  (*Id.*)

The ALJ then asked the VE to consider "a hypothetical person of the same age, education and work background."  (Doc. 13-3 at 51.)  In addition, the ALJ asked the VE to assume the person did not have any physical limitations "but was restricted to simple, routine" tasks.  (*Id.*)  The VE opined that this individual could not perform Plaintiff's past work, but could perform "[t]he full range of unskilled work."  (*Id.*)

Next, the ALJ asked the VE to consider an individual who could perform medium work— including lifting 50 pounds occasionally and 25 pounds frequently— and could "sit, stand or walk six to eight" hours a day.  (Doc. 13-3 at 51.)  In addition, this individual was limited to "simple, routine" tasks in a low-stress environment, which excluded production-oriented and fast-paced jobs.  (*Id.*)  The VE opined such a person could not perform Plaintiff's past relevant past work, but could perform other unskilled jobs.  (*Id.*)  For example, the VE opined the individual could work as a linen room attendant, *DOT* 222.387-030; landscape artist, *DOT* 406.687-010; and cleaner/janitor, *DOT* 381.687-018.  (*Id.*)

Finally, the ALJ asked the VE to evaluate a person who "could lift 20 pounds occasionally, ten pounds frequently" and sit, stand or walk six to eight hours a day.  (Doc. 13-3 at 52)  The ALJ further indicated the person was limited to "occasional overhead reaching with the left upper extremity… [and] occasional stooping crouching, crawling, climbing, [and] kneeling."  (*Id.*)  Additionally, this individual required a low stress environment with simple and routine work, was "unable to concentrate for more than an hour and then would have to be off task for about 15 minutes."  (*Id.*)  The VE opined there was no work for this person, because "[y]ou don't get a 15-minute break every hour."  (*Id.*)

Plaintiff's counsel then asked the VE to consider a person with "marked" limitations with understanding, remembering, and carrying out simple instructions; as well as "[t]he ability to make judgments on a simple work-related decision."  (Doc. 13-3 at 52.)  Also, the person had an "extreme"

---

[1] *The Dictionary of Occupational Titles ("DOT")* by the United States Dept. of Labor, Employment & Training Admin., may be relied upon "in evaluating whether the claimant is able to perform work in the national economy."  *Terry v. Sullivan*, 903 F.2d 1273, 1276 (9th Cir. 1990). The *DOT* classifies jobs by their exertional and skill requirements, and may be a primary source of information for the ALJ or Commissioner. 20 C.F.R. § 404.1566(d)(1).

limitation with understanding, remembering, and carrying out complex instructions.  (*Id.*)  The VE

opined such a person was not capable of any competitive employment.  (*Id.*)

## C.   The ALJ's Findings

Pursuant to the five-step process, the ALJ determined Plaintiff did not engage in substantial

gainful activity after the alleged onset date of July 25, 2010.  (Doc. 13-3 at 14.)  Second, the ALJ found

Plaintiff's severe impairments included: "mild degenerative joint disease of the knees, lumbar

degenerative joint disease, obesity, anxiety, and depression." (*Id.*)  Third, the ALJ found Plaintiff did

not have an impairment or a combination of impairments that met or medically equaled a listing.  (*Id.* at

14-15.)  Next, the ALJ determined:

> [T]he claimant has the residual functional capacity to perform medium work as defined
> in 20 CFR 404.1567(c), including lifting up to 50 pounds occasionally and 25 pounds
> frequently, and sitting, standing, and/or walking 6 to 8 hours in an 8-hour workday.  She
> can perform simple routine tasks.  She can perform low stress jobs in an environment
> that does not require fast-paced production oriented jobs.

(*Id*. at 16.)  With this residual functional capacity, the ALJ found Plaintiff was unable to perform past

relevant work as a reservation clerk.  (*Id.* at 19.)  However, the ALJ determined she was able to

perform "jobs that exist in significant numbers in the national economy," including work as a linen

room attendant, custodian, or landscaper.  (*Id*. at 20.)  Therefore, the ALJ concluded Plaintiff was not

disabled as defined by the Social Security Act.  (*Id.* at 20-21.)

## DISCUSSION AND ANALYSIS

Appealing the decision to deny her application for benefits, Plaintiff states the ALJ erred in

failing to assign proper weight to the opinion of Dr. Damania.  (Doc. 16 at 6.)  In addition, Plaintiff

asserts the ALJ erred in finding her claims of disabling limitations are not credible because the ALJ

did not consider that Plaintiff could not afford treatment.  (*Id.* at 10.)  On the other hand, Defendant

argues the ALJ properly evaluated the medical record and Plaintiff's credibility.  (Doc. 17 at 7.)

## A.   The ALJ's Evaluation of the Medical Record

In this circuit, the courts distinguish the opinions of three categories of physicians: (1) treating

physicians; (2) examining physicians, who examine but do not treat the claimant; and (3) non-

examining physicians, who neither examine nor treat the claimant.  *Lester v. Chater*, 81 F.3d 821, 830

(9th Cir. 1996).  Generally, the opinion of a treating physician is afforded the greatest weight, but it is

not binding on the ultimate issue of a disability.  *Id.*; *see also* 20 C.F.R. § 404.1527(d)(2); *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989).  In addition, an examining physician's opinion is given more weight than the opinion of non-examining physician.  *Pitzer v. Sullivan*, 908 F.2d 502, 506 (9th Cir. 1990); 20 C.F.R. §§ 404.1527(d)(2).  Thus, the courts apply a hierarchy of deference to medical opinions based upon the nature of services provided by the physician.

A physician's opinion may be discounted whether or not another physician contradicts the opinion.  *Magallanes*, 881 F.2d at 751.  An ALJ may reject an *uncontradicted* opinion of a treating or examining medical professional only by identifying "clear and convincing" reasons.  *Lester*, 81 F.3d at 831.  In contrast, a *contradicted* opinion of a treating or examining professional may be rejected for "specific and legitimate reasons that are supported by substantial evidence in the record."  *Id.*, 81 F.3d at 830.  When there is conflicting medical evidence, "it is the ALJ's role to determine credibility and to resolve the conflict."  *Allen v. Heckler*, 749 F.2d 577, 579 (9th Cir. 1984).  The ALJ's resolution of the conflict must be upheld by the Court when there is "more than one rational interpretation of the evidence."  *Id.; see also Matney v. Sullivan*, 981 F.2d 1016, 1019 (9th Cir. 1992) ("The trier of fact and not the reviewing court must resolve conflicts in the evidence, and if the evidence can support either outcome, the court may not substitute its judgment for that of the ALJ").  Here, Plaintiff contends that the ALJ in evaluating the opinion of Dr. Damania, whose opinion was contradicted by other physicians. (Doc. 16 at 8.)

The ALJ indicated he gave less weight to the opinion of Dr. Damania, who "opined the claimant could perform light work."  (Doc. 13-3 at 18.)  Rather, the ALJ gave "significant weight" to the opinions of Drs. Reddy and Wong in concluding Plaintiff is able to perform medium work.  (*Id.*) The ALJ explained Dr. Damania's opinion was given less weight because it was inconsistent with his findings and with the medical record.  (*Id.*)  Significantly, as discussed below, the Ninth Circuit has determined the opinion of an examining physician may be rejected for the reasons articulated by the ALJ.  *See, e.g., Batson v. Comm'r of the Soc. Sec. Admin.*, 359 F.3d 1190, 1195 (9th Cir. 2003); *Tommasetti v. Astrue*, 533 F.3d 1035, 1041 (9th Cir. 2008).

      1.      Inconsistencies with Dr. Damania's findings

The Ninth Circuit explained the opinion of an examining physician may be rejected where an

ALJ finds incongruity between a doctor's assessment and his own medical records, and the ALJ explains why the opinion "did not mesh with [his] objective data or history." *Tommasetti*, 533 F.3d at 1041; *Morgan v. Comm'r of the Soc. Sec. Admin*., 169 F.3d 595, 603 (9th Cir. 1999) (explaining inconsistencies supports the decision to discount the opinion of a physician).

The ALJ noted the physical examination Dr. Damania "recorded was entirely normal other than obesity and high blood pressure (without end organ damage)." (Doc. 13-3 at 18.)  In addition, the ALJ observed that Dr. Damania found Plaintiff had "normal range of motion of all joints, full motor strength, etc."[2]  (*Id.*)  Specifically, Dr. Damania found Plaintiff's range of motion was normal in her back, shoulders, elbows, hips, knees and hands; and her strength was "5/5 in all extremities."  (Doc. 13-8 at 51-52.)   In addition, as noted by the ALJ, Plaintiff was not taking prescription medication for her pain at the time of the examination.  (Doc. 13-3 at 18.)  Because the ALJ carried the burden to identify inconsistencies between the results of Plaintiff's physical examination and the conclusion that Plaintiff was unable to perform more than light work, the inconsistencies support the ALJ's decision to give less weight to the opinion of Dr. Damania.

### 2.   Inconsistencies with the medical record as a whole

The Ninth Circuit has determined that inconsistency with the overall record constitutes a legitimate reason for discounting a physician's opinion.  *Morgan v. Comm'r of the Soc. Sec. Admin*, 169 F.3d 595, 602-03 (9th Cir. 1999).  However, to reject an opinion as inconsistent with the medical record, the "ALJ must do more than offer his conclusions." *Embrey v. Bowen*, 849 F.2d 418, 421 (9th Cir. 1988).  The Ninth Circuit explained: "To say that medical opinions are not supported by sufficient objective findings or are contrary to the preponderant conclusions mandated by the objective findings does not achieve the level of specificity our prior cases have required." *Embrey*, 849 F.2d at 421-22.

The ALJ found the "medical record and overall evidence were entirely consistent with the ability to perform a full range of work at the medium level of exertion."  (Doc. 13-3 at 18.)  The ALJ

---

[2] Plaintiff contends that "[t]he ALJ's commentary that Dr. Damania's exam findings "were *essentially* normal", … is pure lay opinion and does not constitute reasonable grounds to dismiss the medical conclusion of the expert who actually conducted the examination." (Doc. 16 at 6).  However, as noted, Dr. Damania repeatedly determined Plaintiff's range of motion was "WNL"—or within *normal* limits.  (Doc. 13-8 at 50-52.)  Thus, the ALJ was merely summarizing the findings of Dr. Damania, not substituting her opinion for that of the physician.

1   explained, "[n]o treating physician gave an opinion of the claimant's functional abilities." (*Id.*)

2   Furthermore, the ALJ noted that Plaintiff was first seen by her doctor for her disability in July 2010,

3   but, at that time she was only seen for right thumb pain and no other pain was documented. (*Id.*)

4   Plaintiff was not seen again for pain until May 2011, when she was diagnosed with arthralgia— but the

5   physical examination by Dr. Damania was normal, indicating "normal strength, sensation, and gait."

6   (*Id.*)  The ALJ noted the most recent tests showed only "mild degenerative joint disease of the knees

7   and disc space narrowing of her lumbar spine at L2-3." (*Id.*)

8          Moreover, as the ALJ observed, the medical record was reviewed by Drs. Reddy and Wong,

9   who concluded "that the claimant's physical impairments were non-severe." (Doc. 13-3 at 18.)

10   According to Dr. Reddy, there was "no objective basis" for the limitation to light work, particularly

11   given the findings that Plaintiff had a "[n]ormal exam of all joints" as well as "[n]ormal strength,

12   sensation, and gait." (Doc. 13-8 at 56.)  Likewise, Dr. Wong determined Plaintiff's "overall" physical

13   examination results were "completely" normal, and her physical impairments were not severe. (*Id.* at

14   93.)  Because the ALJ met his burden to identify evidence in the record—including Dr. Damania's own

15   physical examination and the opinions of Drs. Reddy and Wong—the longitudinal evidence supports

16   the ALJ's decision to give minimal weight to the opinion.[3]  *See Morgan*, 169 F.3d at 602-03;

17   *Tommasetti*, 533 F.3d at 1041.

18   **B.     The ALJ's Credibility Determination**

19          When evaluating a claimant's credibility, an ALJ must determine first whether objective

20   medical evidence shows an underlying impairment "which could reasonably be expected to produce

21   the pain or other symptoms alleged." *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035-36 (9th Cir. 2007)

22   (quoting *Bunnell v. Sullivan*, 947 F.2d 341, 344 (9th Cir. 1991)).  Next, if there is no evidence of

23   malingering, the ALJ must make specific findings as to the claimant's credibility. *Id.* at 1036.  In this

24   case, the ALJ determined Plaintiff's "medically determinable impairments could reasonably be

25   expected to cause the alleged symptoms." (Doc. 13-3 at 16.)  However, the ALJ concluded Plaintiff's

26

27          [3] Significantly, the opinions of Drs. Reddy and Wong are substantial evidence in support of the conclusion that
     Plaintiff is physically able to perform work in the national economy, because they are consistent with the findings of Drs.

28   Damania and Ramish that she has a normal range of motion and strength. *See Tonapetyan v. Halter*, 242 F.3d 1144, 1149
     (9th Cir. 2001); *Andrews v. Shalala*, 53 F.3d 1035, 1042 (9th Cir. 1995).

"statements concerning the intensity, persistence and limiting effects of the[] symptoms are not entirely credible." (*Id.*)

An ALJ must base an adverse credibility determination on clear and convincing evidence where there is no affirmative evidence of a claimant's malingering and "the record includes objective medical evidence establishing that the claimant suffers from an impairment that could reasonably produce the symptoms of which he complains." *Carmickle v. Comm'r of Soc. Sec. Admin.*, 533 F.3d 1155, 1160 (9th Cir. 2008). Factors the ALJ may consider include, but are not limited to: (1) the claimant's reputation for truthfulness, (2) inconsistencies in testimony or between testimony and conduct; (3) the claimant's daily activities, (4) an unexplained, or inadequately explained, failure to seek treatment or follow a prescribed course of treatment and (5) testimony from physicians concerning the nature, severity, and effect of the symptoms of which the claimant complains. *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989); *see also Thomas v. Barnhart*, 278 F.3d 947, 958-59 (9th Cir. 2002). To support an adverse credibility determination, the ALJ "must identify what testimony is not credible and what evidence undermines the claimant's complaints." *Lester v. Chater*, 81 F.3d 821, 834 (9th Cir. 1996).

In this case, the factors ALJ considered included the treatment Plaintiff received, gaps in treatments and conflicts between Plaintiff's statements and the objective medical record. (Doc. 13-3 at 15, 18.) The Ninth Circuit has determined these may be relevant factors in assessing the credibility of a claimant. *See Fair,* 885 F.2d at 603; *Thomas*, 278 F.3d at 958-59.

### 1.    Treatment prescribed

When assessing a claimant's credibility, the ALJ may consider "the type, dosage, effectiveness, and side effects of any medication." 20 C.F.R. §§ 404.1529(c), 416.929(c). Further, the treatment Plaintiff received, especially when conservative, is a legitimate consideration in a credibility finding. *Meanel v. Apfel*, 172 F.3d 1111, 1114 (9th Cir. 1999) (the ALJ properly considered the physician's failure to prescribe medical treatment commensurate with the "supposedly excruciating pain" alleged); *Parra v. Astrue*, 481 F.3d 742, 750-51 (9th Cir. 2007) ("evidence of 'conservative treatment' is sufficient to discount a claimant's testimony regarding severity of an impairment").

The ALJ found Plaintiff "received limited treatment that was inconsistent with her current allegations of severe symptoms." (Doc. 13-3 at 19.) For example, the ALJ observed that Plaintiff

"was not referred for specialized mental health treatment" and was "never hospitalized in a psychiatric setting." (*Id.* at 17, 18.)  In addition, the ALJ noted that after the alleged onset date, "[t]he medical record showed the claimant has not received … treatment for pain" beyond a single physical therapy session.  (*Id.* at 19.)  As the ALJ concluded, the medical record indicates Plaintiff received only limited and conservative treatment for her alleged mental and physical impairments.  *See, e.g., Tommasetti*, 533 F.3d at 1040 (describing physical therapy as conservative treatment).  Consequently, the treatment prescribed by Plaintiff's physicians supports the adverse credibility determination.

### 2.       Gaps in treatment

The Ninth Circuit determined a claimant's "failure to seek treatment" supports an adverse credibility determination.  *Fair*, 885 F.2d at 603.  Similarly, an ALJ may determine a claimant's statements are "less credible if the level or frequency of treatment is inconsistent with the level of complaints."  SSR 96-7p, 1996 SSR LEXIS 4, at *21.  Thus, gaps in treatment may suggest a lower level of pain and functional limitations than a claimant alleges.  *See Johnson v. Shalala*, 60 F.3d 1428, 1434 (9th Cir. 1995); *see also Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989) ("unexplained, or inadequately explained, failure to seek treatment . . . can cast doubt on the sincerity of the claimant's pain testimony").  When rejecting testimony for gaps in treatment, an ALJ must "consider[] any explanations that the individual may provide, or other information in the case record, that may explain infrequent or irregular medical visits or failure to seek treatment."  SSR 96-7p, 1996 SSR LEXIS 4, at *22.  For example, the Ninth Circuit has held gaps in treatment do not constitute a clear and convincing reason for discounting credibility if the claimant lacked the financial ability to pay for treatment.  *Orn*, 495 F.3d at 638 (9th Cir. 2007).

The ALJ found "there were significant gaps in treatment," which further diminished Plaintiff's credibility.  (Doc. 13-3 at 19.)  However, Plaintiff argues the ALJ erred in considering this factor because the ALJ did not "acknowledge [Plaintiff's] lack of medical insurance."  (Doc. 16 at 11.)  Plaintiff contends she elected to discontinue physical therapy in 2009—prior to the alleged onset date—"due to financial reasons."  (*Id.* at 10)  Plaintiff asserts also that she stopped seeing a counselor "because she had no insurance."  (*Id.*, internal quotation marks omitted.)  Further, Plaintiff notes Dr. Lozano indicated she had "been unable to afford testing" on her knee and back pain, which she sought

treatment at Clinica Sierra Vista.  (*Id.*)

On the other hand, Defendant argues "the record does not come even close to suggest[ing] that Plaintiff needed more treatment than what she sought and received."  (Doc. 11 at 9.)  Defendant asserts:

[T]he record reflects that:

(1) Plaintiff was discharged from physical therapy at a time she reported doing better (Tr. 374);

(2) While Plaintiff reported she had no insurance to see a counselor, Dr. Lozano observed that she was oriented, her mood and affect were appropriate, and she had normal judgment and insight despite depression with anxiety and dysthymic disorder (Tr. 457-458);

(3) While Plaintiff reported she could no longer afford Celexa for depression, Dr. Swanson opined that she had no significant work limitations after reviewing Plaintiff's history and completing an examination (Tr. 430-434); and

(4) While complaining of her knees and back and stating she had been unable to afford testing, Plaintiff had x-rays taken of her neck, lower back and knees that failed to reveal significant anomalies (Tr. 499, 538).

(Doc. 17 at 8-9.)  Accordingly, Defendant contends "Plaintiff has failed to demonstrate that the ALJ erred in not considering her ability to afford any treatment that she actually needed."  (*Id.* at 9.)

Indeed, as Defendant observes, when Plaintiff requested to be discharged from physical therapy in September 2009, she reported her shoulders were "doing better and were no longer 'achy' at rest."  (Doc. 13-8 at 2.)  In addition, when Plaintiff stopped her therapy sessions in February 2010, Plaintiff informed Ms. Lansing she was "doing better with [anxiety]" and "sleeping better," but "want[ed] to catch up on copays" and would "call when ready to [return]."  (*Id.* at 5.)  Similarly, although Plaintiff told Dr. Lozano she was "unable to afford testing" for her reported pain, Plaintiff had x-rays taken three days later at Clinica Sierra Vista of her knees, lumbar spine, and cervical spine. (Doc. 13-9 at 14, 50, 55.)  Thus, the record is ambiguous as to whether Plaintiff, in fact, did not seek or pursue treatment based solely on inability to pay.[4]

Nevertheless, because the ALJ did not address Plaintiff's financial constraints and did not consider whether the gaps in treatment were due to her inability to afford visits to the doctor, the gaps in treatment cannot support the adverse credibility determination.  *See* SSR 96-7p, 1996 SSR LEXIS

---

[4] Moreover, at the hearing Plaintiff testified that she discontinued physical therapy due to pain, and did not indicate there was a financial reason for stopping the treatment.  (Doc. 13-3 at 38.)

4, at *22; *Orn*, 495 F.3d at 638 (9th Cir. 2007).

### 3.   Inconsistencies with the medical record

In general, "conflicts between a [claimant's] testimony of subjective complaints and the objective medical evidence in the record" can constitute "specific and substantial reasons that undermine . . . credibility." *Morgan v. Comm'r of Social Sec. Admin.*, 169 F.3d 595, 600 (9th Cir. 1999). The Ninth Circuit explained, "While subjective pain testimony cannot be rejected on the sole ground that it is not fully corroborated by objective medical evidence, the medical evidence is still a relevant factor in determining the severity of the claimant's pain and its disabling effects." *Rollins v. Massanari*, 261 F.3d 853, 857 (9th Cir. 2001); *see also Burch*, 400 F.3d at 681 (the "lack of medical evidence cannot form the sole basis for discounting pain testimony"). Because the ALJ did not base the decision solely on the fact that the medical record did not support the degree of symptoms alleged by Plaintiff, the objective medical evidence was a relevant factor in determining Plaintiff's credibility.

However, if an ALJ cites the medical evidence as part of a credibility determination, it is not sufficient for the ALJ to simply state that the testimony is contradicted by the record. *Holohan v. Massanari*, 246 F.3d 1195, 1208 (9th Cir. 2001) ("general findings are an insufficient basis to support an adverse credibility determination"). Rather, an ALJ must "specifically identify what testimony is credible and what evidence undermines the claimant's complaints." *Greger v. Barnhart*, 464 F.3d 968, 972 (9th Cir. 2006); *see also Dodrill v. Shalala*, 12 F.3d 915, 918 (9th Cir. 1993) (an ALJ must identify "what evidence suggests the complaints are not credible").

In this case, the ALJ found Plaintiff's "reported symptoms are not supported by the medical record, consultative findings, or her own treating physician's medical source statement." (Doc. 13-3 at 19.) For example, although Plaintiff was diagnosed with joint pain, she had "a normal examination of all joints, including fingers." (*Id.* at 18.) Similarly, Plaintiff "had normal strength, sensation, and gait." (*Id.*) In addition, the ALJ found Plaintiff's subjective complaints about her mental abilities was not consistent with the record, because although Plaintiff "reported being forgetful, [her] cognitive testing showed her memory was intact." (*Id.*) As the ALJ observed, Dr. Swanson found Plaintiff's "memory functioning was intact" and her "[m]ental and emotional functioning fell within normal limits" with the WMS-IV and WAIS-IV tests. (*Id.* at 17; *see also* Doc. 13-8 at 61.)

Because the ALJ met the burden to identify specific evidence in the record that undermined the credibility of Plaintiff's complaints, the objective medical record supports the adverse credibility determination. *See Greger*, 464 F.3d at 972; *Johnson*, 60 F.3d at 1434 (an ALJ may consider "contradictions between claimant's testimony and the relevant medical evidence").

### 4.     Reliance upon an invalid reason

When an ALJ sets forth a legally insufficient to support the adverse credibility determination, the Court must consider whether the reliance on invalid reasons was a harmless error. *See Batson v. Comm'r of the Soc. Sec. Admin*, 359 F.3d 1190, 1195-97 (9th Cir. 2003) (applying a harmless error standard where the credibility finding was invalid). The Ninth Circuit explained, "So long as there remains 'substantial evidence supporting the ALJ's conclusion's on credibility' and the error 'does not negate the validity of the ALJ's ultimate credibility conclusion,' such [error] is deemed harmless." *Carmickle*, 533 F.3d at 1162 (quoting *Batson*, 359 F.3d at 1197).

The ALJ failed to consider whether the gaps in seeking treatment were due to Plaintiff's inability to pay. However, the ALJ set forth clear and convincing reasons for finding Plaintiff lacked credibility, including inconsistencies between her testimony and conduct, the treatment prescribed by physicians, and the medical record. In addition, the RFC determination is supported by substantial evidence in the record, including the opinions of Drs. Swanson, Reddy and Wong, who opined Plaintiff did not have physical or mental limitations that precluded her from performing medium, low stress and "simple, repetitive" work.[5]  (*See* Doc. 11-8 at 34-35; Doc. 11-4 at 33)  Accordingly, the ALJ's partial reliance upon an invalid reason was a harmless error.

## CONCLUSION AND ORDER

For the reasons set for above, the Court finds the ALJ set forth legally sufficient reasons to give less weight to the opinion of Dr. Damania, and clear and convincing reasons that were "sufficiently specific to permit the court to conclude the ALJ did not arbitrarily discredit [the] claimant's testimony."

---

[5] When an examining physician such as Dr. Swanson forms an opinion that "rests on his own independent examination," the opinion is substantial evidence. *Tonapetyan v. Halter*, 242 F.3d 1144, 1149 (9th Cir. 2001); *see also Orn v. Astrue*, 495 F.3d 625, 632 (9th Cir. 2007) (when an examining physician provides independent clinical findings, such findings are substantial evidence in support of an ALJ's ultimate decision). Because the opinion of Dr. Swanson was formed based upon the examination of Plaintiff and administration of the IQ and memory scores, the opinion qualifies as substantial evidence.

*See Thomas*, 278 F.3d at 958.   Therefore, the ALJ's determination that Plaintiff is not disabled must be upheld by the Court.  *Sanchez*, 812 F.2d at 510.

Based upon the foregoing, **IT IS HEREBY ORDERED**:

1.      The decision of the Commissioner of Social Security is **AFFIRMED**; and

2.      The Clerk of Court **IS DIRECTED** to enter judgment in favor of Defendant Carolyn W. Colvin, Acting Commissioner of Social Security, and against Plaintiff Mollie Perez.

IT IS SO ORDERED.

Dated:   **August 8, 2016**                          **/s/ Jennifer L. Thurston**
                                                     UNITED STATES MAGISTRATE JUDGE